FILED & JUDGMENT ENTERED
Steven T. Salata

Jun 09 2016

Clerk, U.S. Bankruptcy Court
Western District of North Carolina

J. Craig Whitley
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | | |
|---|---|---|
| In Re: | ) | |
| | ) | |
| **Lametsha Busel Crawford** | ) | |
| | ) | |
| | ) | Case No. 13-30843 |
| | ) | Chapter 7 |
| Debtor. | ) | |
| | ) | |
| **John W. Taylor,** *Trustee for the* | ) | |
| *Bankruptcy Estate of* | ) | |
| *Lametsha Busel Crawford* | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | Adversary Proceeding |
| | ) | No. 14-03219 |
| v. | ) | |
| | ) | |
| **Lametsha Busel Crawford** | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER DENYING DEBTOR A DISCHARGE**

In this adversary proceeding, the Chapter 7 trustee, John W. Taylor, seeks an order denying the debtor, Lametsha Crawford, her discharge. The matter came on for

1

trial on March 24, 2016.[1] Crawford appeared and was represented by attorney Barbara L. White. Taylor appeared on his own behalf. For the reasons set forth below, Crawford's discharge is denied.

Taylor accuses Crawford of numerous wrongs that he believes constitute making false oaths, concealing or withholding property of the estate, and falsifying or failing to preserve financial records. The thrust of Taylor's theory is that Crawford's petition, signed under penalty of perjury, contained significant intentional or reckless misstatements regarding her assets. Taylor asserts that Crawford furthered these false oaths with misleading and inaccurate testimony at her first meeting of creditors and a 2004 examination. In the over two years since this case was filed, Crawford failed to correct these omissions. Accordingly, Taylor would have this Court deny Crawford's discharge under Code Subsection 727(a), which precludes debtors from knowingly and fraudulently making a false oath in connection with their bankruptcy case.

**I.     Facts**

    **a.  False Oaths/Concealment Related to Real Property**

Taylor asserts that Crawford intentionally, or at least recklessly, misrepresented her real estate holdings on Schedule A of her bankruptcy petition.

Crawford's scheduled her real property holdings as follows:

1. Crawford "held" 215 McFadden Street in Rock Hill, South Carolina for her great-uncle, David Jennings.

2. Crawford "held" 2609 Hart Road in Charlotte, North Carolina for Tracy Murphy.

---

[1] Prior to the trial, the Court denied Crawford's motion for summary judgment by order dated February 12, 2016 and denied creditor Ladd A. Morrison's motion to intervene on February 19, 2016.

2

3. Crawford owned a time-share at 7751 Black Lake Road in Kissimee, Florida jointly with David Jennings.

4. Crawford owned two lots in Rock Hill, South Carolina jointly with David Jennings.

5. Crawford scheduled a third lot in Rock Hill, South Carolina but did not indicate the nature of her interest in the property.

The evidentiary record established that Crawford's Schedule A was fraught with misstatements and omissions related to her real estate holdings:

1. Regarding 215 McFadden Street in Rock Hill, South Carolina, Crawford owned the property in fee simple as a result of a January 30, 2008 conveyance to Crawford from David Jennings. Her statement that she "held" the property for Jennings was not accurate. *See* Case 13-30843, Doc. 42 at pg. 5 (sustaining trustee's objection to claim of exemption in the property).

2. Regarding 2609 Hart Road in Charlotte, North Carolina, Crawford owned the property in fee-simple as a result of a conveyance to Crawford from Tracy Murphy in either 2008 or 2009. Her statement that she "held" the property for Murphy was not accurate.

3. Regarding the time-share 7751 Black Lake Road in Kissimee, Florida, Crawford later amended her schedule to change her ownership interest to "fee-simple/tenancy in severalty."

4. Regarding the lots in Rock Hill, South Carolina. Crawford actually owned five lots, not three as she initially scheduled. And, Crawford owned those lots in fee simple, not jointly with Jennings as she had scheduled.

When confronted with these discrepancies at trial, Crawford admitted her petition was incorrect. Regarding the Hart Road property, Crawford and her attorney's positions are somewhat at odds. Crawford testified she "would have given the property back" to Murphy had he asked for it and thus believed she was not the owner at the time she filed bankruptcy. Crawford's attorney indicated the "held for" language was included to somehow help the trustee understand the situation. Crawford's 2004 examination provided a third explanation. There, Crawford indicated that she believed the house was

3

hers, the house was in her name in 2008 or 2009, and the wording on the petition was "wrong." *See* Pl's Ex. 17 at pgs. 27-29.

Pertaining to the lots in Rock Hill, Crawford attributes the discrepancies on her petition to her confusion due to property tax bills from several years before the petition date that included Jennings' name. Crawford testified that she believed that she and Jennings owned the properties together. Crawford offered little explanation as to why she relied on property tax bills that were clearly out of date nor why two parcels in Rock Hill were omitted from the schedules altogether. Despite valuing these lots at $33,000 free of any secured claims, Crawford admitted that she took no steps prior to bankruptcy to ascertain her ownership interest in the lots.

### b. False Oaths Regarding Payments to Creditors and Failure to Account for Insurance Proceeds

Taylor next claims that Crawford failed to include thousands of dollars in payments to creditors that she made within one year of bankruptcy. On Crawford's Statement of Financial Affairs, Crawford indicated that she had made no such payments.

Yet, Crawford admitted at the trial that this was incorrect. Crawford testified that her home was robbed prior to bankruptcy. Though nature of the goods stolen was never made clear, Crawford apparently received approximately $80,000 in insurance payments as a result of the robbery. From that, Crawford made payments within a year of bankruptcy to at least three creditors as well as payments to a business entity that she owned and controlled. The payments to creditors included $30,000 to her former boyfriend (Ladd Morrison),[2] $7500 to a friend/co-worker (Arlene Foulks), and $10,000 to

---

[2] Crawford later testified the amount was $37,000.

4

her son's father (James Ridenbacker). Crawford stated at the trial that she disclosed all these payments to her attorney but could not explain why the transactions were missed when she signed her petition. It never became clear what happened to the nearly $32,500 of the original $80,000 that remained unaccounted for after these transactions.

### c. False Oaths/Concealment regarding Payment to Arlene Foulks

Based on Crawford's delinquent disclosure of alleged loan repayments to Foulks, Taylor brought an action against Foulks to recover what he then believed to be either fraudulent or preferential transfers. Adv. No. 15-3068. However, Taylor dismissed the action upon receipt of a sworn declaration from Foulks. According to Foulks, Crawford gave her a cashiers check for $7500. That payment was not in satisfaction of a loan. Rather, Foulks stated that Crawford asked her to deposit the check into Foulks' account, withdraw cash, and give the cash to Crawford, which she did. Foulks' testimony at the trial echoed her sworn declaration, and she produced a withdrawal statement indicating that $7500 in cash was indeed withdrawn from her account shortly after she deposited the check. Pl's Ex. 12. Taylor alleges the payment to Foulks was a sham to further conceal estate assets.

### d. False Oaths/Concealment regarding Bank Accounts

Taylor further argues that Crawford failed to disclose at least three bank accounts on her initial petition. Crawford and her son's father, James Ridenbacker, held two joint accounts at Branch Banking and Trust. Crawford admitted that her petition failed to disclose those accounts. She now says this was due to her own error. Crawford amended her Schedule B on May 6, 2015 to disclose the joint account, but then, on September 10, 2015, amended her Schedule B again to exclude the account. When asked why the last

5

amendment did not include the accounts she held with Ridenbacker, Crawford could not provide an explanation.

Crawford also failed to disclose a third BB&T account she opened sometime in 2012 for Ladd Morrison as his attorney in fact. To provide some background, Morrison and Crawford were in a relationship that ended in 2009. After Crawford and Morrison were estranged, Crawford became Morrison's attorney in fact to handle Morrison's finances while Morrison was incarcerated. Crawford testified that Morrison has repeatedly threatened her since that time. Nonetheless, she agreed to be Morrison's attorney in fact as a favor to Morrison's cousin with whom she has a close familial-type relationship. This explanation is highly suspicious and not likely the entire truth.

At the trial, Crawford testified that she opened the BB&T account for Morrison (the Morrison account) after the roof on Morrison's home was damaged. At that time, Morrison was in prison. The mother of Morrison's child was living in the home, and an account in Morrison's name was needed to deposit the insurance check obtained as a result of the damage.

To allegedly repay debts owed to Morrison,[3] Crawford claimed she deposited her own money into the Morrison account and endorsed those checks as Morrison's power of attorney. Crawford then withdrew $37,000 cash from the account between December 3, 2012 and December 17, 2012. Essentially, she treated the account as if it were her own. According to Crawford, she gave the cash to Morrison's cousin at Morrison's request.

---

[3] The nature or proof of that debt was never disclosed. At one juncture Crawford testified she repaid $30,000 to Morrison. Later, she testified that she withdrew $37,000 cash to repay Morrison.

6

Taylor filed an adversary proceeding against Morrison to recover these sums under Code Sections 547, 548 and 550. Adv. No. 15-3066. Morrison moved to dismiss the action asserting, *inter alia*, that Crawford was writing checks in Morrison's name, cashing them, and keeping the money. *Id*. at Doc. 21. Afterward, and apparently convinced of this, Taylor voluntarily dismissed the action.

The Morrison account was not disclosed on Crawford's original petition. Nor was it disclosed at her first meeting of creditors, nor at her 2004 examination, nor when she amended her schedules on May 6, 2015, nor when Crawford moved for summary judgment. In fact, the parties agree that Taylor was not apprised of the account or these transactions until sometime after the summary judgment hearing, over two years after Crawford filed bankruptcy, and during the parties' final preparation for this trial. Crawford then amended her schedules again nearly three months later on September 10, 2015 to include the Morrison account. Taylor eventually had to subpoena the bank records of that account from BB&T. *See* Pl's Ex. 11.

## II. Applicable Law

Bankruptcy is meant to provide honest but unfortunate debtors a fresh start "unhampered by the pressure and discouragement of preexisting debt." *Farouki v. Emirates Bank Intern., Ltd.*, 14 F.3d 244, 249 (4th Cir. 1994) (quoting *Lines v. Frederick*, 400 U.S. 18, 19 (1970)). That right "to a fresh start depends upon the honest and forthright invocation of the Code's protections" and the debtor's fulfillment of a number of enumerated duties and obligations. *In re Kestell*, 99 F.3d 146, 149 (4th Cir. 1996).

Among other prerequisites, the bankruptcy code requires debtors to fully and accurately disclose their finances and assets and be accommodating in the administration

of their bankruptcy estate. For instance, Code Subsection 521(a)(1) obliges debtors to file "a schedule of assets and liabilities, a schedule of current income and current expenditures, and a statement of the debtor's financial affairs[,]" all of which are filed under the penalty of perjury per 28 U.S.C. §1746. Under Subsection 521(a)(3), debtors must cooperate with their trustee in the performance of his duties. Similarly, bankruptcy Rule 4002(a)(4) mandates that debtors "cooperate with the trustee in the preparation of" the complete inventory of the debtor's property required by Rule 2015(a)(1). Code Subsection 521(a)(4) demands that a debtor surrender all property of the estate and any recorded information, including books, documents, records, and papers, relating to property of the estate to the trustee.

Filing bankruptcy is a serious undertaking and these are serious duties. Accordingly, those who "play fast and loose with their assets or with the reality of their affairs" risk losing their discharge under Code Section 727. *Farouki*, 14 F.3d at 249 (quoting *In re Tully*, 818 F.2d 106, 110 (1st Cir.1987)). The trustee bears the initial burden to prove by a preponderance of the evidence that debtors are not entitled to a discharge. *Id*.; Fed. R. Bankr. P. 4005. Once the trustee has established a prima facie case, the debtor must come forward with a credible explanation was to why the discharge should nevertheless be granted. *Farouki*, 14 F.3d at 249 n. 16 (citation omitted).

Under Code Subsection 727(a)(4)(A), a debtor's discharge should be denied if "the debtor knowingly and fraudulently, in or in connection with the case—made a false oath or account." 11 U.S.C. § 727(a)(4)(A). "The purpose of this section is to 'ensure that a debtor provides complete and accurate information to the bankruptcy court and those with an interest in the administration of the debtor's estate.' " *Sigmon v. Belk* (*In re*

8

*Belk*), 509 B.R. 513, 519 (Bankr. W.D.N.C. 2014) (citation omitted). Without full, honest disclosure, the bankruptcy system would grind to a halt, and creditors and trustees would be forced expend substantial estate resources and time to determine whether the information provided is true. Thus, Section 727 is necessary to both protect the integrity of the bankruptcy system and to ensure its efficient and equitable operation.

To succeed on a claim under 11 U.S.C. § 727(a)(4)(A), the trustee must prove by a preponderance of the evidence that the debtor knowingly made a false statement under oath that related to a material matter in the case. *Belk*, 509 B.R. at 519 (citations and quotation marks omitted). In making the false statement, the debtor must have acted with fraudulent intent. *Id*.

"A debtor's petition, schedules, statement of financial affairs, statements made at a 341 meeting, testimony given at a 2004 examination, and answers to interrogatories all constitute statements under oath for purposes of § 727(a)(4)(A)." *Id.* (citations omitted). A statement under oath includes a debtor's omission on the petition, statement of financial affairs, statements made at a 341 meeting, and testimony given at a 2004 examination. *Id*. An omission is material under 11 U.S.C. 727(a)(4)(A), "if it bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property." *Williamson v. Fireman's Fund Ins. Co.*, 828 F.2d 249, 252 (4th Cir. 1987) (citation and quotation marks omitted).

Fraudulent intent "involves a material representation that the debtor knows to be false or an omission that the debtor knows will create an erroneous impression." *Belk*, 509 B.R. at 520 (citations and quotation marks omitted). Establishing that a debtor acted

9

with reckless indifference for the truth satisfies the fraudulent intent element. *Id.* (citation omitted); *Diorio v. Kreisler-Borg Const. Co.*, 407 F.2d 1330, 1331 (2d Cir. 1969) ("Statements called for in the schedules, or made under oath in answer to questions propounded during the bankrupt's examination or otherwise, must be regarded as serious business; reckless indifference to the truth . . . is the equivalent of fraud."). Direct evidence of fraudulent intent is generally not available as a debtor is unlikely to make such an admission. Consequently, courts consider circumstantial evidence and a debtor's course of conduct. *Belk*, 509 B.R. at 520 (citations and quotation marks omitted).

### III. Analysis

As an initial note, it is worth clarifying the crux of the Court's conclusions in this case. By themselves, Crawford's misstatements regarding the Morrison account are sufficient to cost her a discharge. While the other incidents reveal that Crawford is indifferent to the serious undertaking of filing bankruptcy, in isolation, these other falsehoods may not rise to the same level and each standing alone is perhaps not sufficient to revoke her discharge. However, each incident must be viewed in light of the others. When considering the totality of the circumstances, Crawford has established a clear course of conduct throughout this case of playing fast and loose with her assets and sworn statements.

### a. False Oaths/Concealment Related to Real Property

Turning first to Crawford's description of her ownership interest in the properties at 215 McFadden Street and 2609 Hart Road, Crawford's testimony at trial and during her 2004 examination reveal that her use of the phrase "held for" on her petition was false, which she knew at the time she signed her petition. When asked about the Hart Road property, Crawford indicated at her 2004 examination that she believed the house was hers, the house was in her name in 2008 or 2009, and the wording on the petition was "wrong." *See* Pl's Ex. 17 at pgs. 27-29.

As for Crawford's intent, "held for" clearly connotes that Crawford owned less than fee simple, her true ownership interest.[4] Most commonly, property is "held" in trust "for" a beneficiary.[5] *See* N.C.G.S. § 36C-1-101 *et seq*. And, creditors of the trustee typically have no recourse against the trust corpus as the trust is not property of the trustee. 11 U.S.C. § 541(d). By indicating that Crawford held these properties for other parties, the only reasonable interpretation is that Crawford was a trustee and did not hold an equitable ownership interest in the property, at least not one that would likely yield any benefit to creditors. At the very least, the inclusion of the held for language created an "erroneous impression" of her ownership interest and was a reckless disregard for the truth. *Belk*, 509 B.R. at 520 (citations and quotation marks omitted).

---

[4] Crawford's petition indicated there was over $50,000 in unencumbered equity in these two properties. The distinction and significance between "fee simple" and "held for" also illustrates the materiality of this misstatement.

[5] Crawford's contention at trial that "held for" was merely her layman way of describing her actual arrangement with the former property owners is unavailing. Crawford is a savvy businesswoman and has owned and operated at least two successful companies. She is not *pro se*. She is represented by an experienced bankruptcy practitioner.

Crawford's omission and misstatements regarding her interests in the Rock Hill lots were likewise problematic. As noted above, Crawford wholly omitted certain parcels of property from her schedules, and she never provided an explanation for these outright omissions. Crawford attributed the discrepancies over her ownership interest in three of the lots to her use of property tax bills from several years before the petition date that included Jennings' name. One would assume that from the current year tax bill, and payment of the same, that Crawford would know offhand how these properties were truly held or at least be on notice to inquire further. Yet, Crawford admitted that she took no steps prior to bankruptcy to ascertain her ownership interest in the lots.

Debtors may not remain willfully ignorant of their affairs and expect to reap the benefits of the bankruptcy system.[6] Before filing a sworn statement in a bankruptcy, debtors must make a reasonable inquiry into the statement's accuracy. Looking to nothing more than old tax statements is not reasonable, especially considering that Crawford was represented by counsel and that property records are readily available via the Internet. Crawford's lackadaisical effort into ensuring the accuracy of her schedule of real property exhibits that she either was attempting to conceal assets or fails to grasp the serious undertaking of filing bankruptcy. *Farouki*, 14 F.3d at 249 (quoting *Tully*, 818 F.2d at 110).

---

[6] To be sure, attorneys are entitled to trust their clients, but those representing debtors may also not remain willfully ignorant of the truthfulness of their client's statements. *See* Fed. R. Bankr. P. 9011(b)(3) ("By presenting to the court (whether by signing, filing, submitting, or later advocating) a petition, pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, *formed after an inquiry reasonable under the circumstances*, . . . the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery. . . ." (emphasis added)).

### b. False Oaths Regarding Payments to Creditors and Failure to Account for Insurance Proceeds

On Crawford's Statement of Financial Affairs, Crawford indicated that she had made no payments to creditors, which she admitted at trial was false. These payments were material, amounting to $47,500. Having personally paid these monies, in some instances with cash and in one instance to an entity she owned, Crawford can hardly argue that she did not know her Statement of Financial Affairs was inaccurate when she signed her petition. As for her intent, Crawford claims she disclosed these payments to her attorney and thus implies these misstatements were her attorney's fault.

Even if Crawford's testimony were true, debtors are not able to blindly sign their petition and later claim they were unaware of the contents. Arguably, signing a document under oath before reading it is, in itself, a reckless disregard for the truth. *E.g., In re Chesson*, No. ADV 09-09064, 2012 WL 4794148, at *8 (Bankr. M.D.N.C. Oct. 9, 2012), as amended (Oct. 15, 2012) (concluding that the defendant's signing title insurance affidavits "without reading them or making any inquiry exhibited a gross indifference to whether the Affidavits were truthful"). At the least, Crawford's failure to disclose these payments on her petition shows that she fails to grasp the serious undertaking of filing bankruptcy and that she played fast and loose with the truth. *Farouki*, 14 F.3d at 249 (quoting *Tully*, 818 F.2d at 110).

To briefly mention the missing insurance funds, $32,500, the thrust of Taylor's theory relates to § 727(a)(4)(A) and Crawford's false oaths. It bears noting that a debtor's discharge may also be denied under § 727(a)(3) for failure to preserve records and under § 727(a)(5) for failing to explain a loss in assets. For now, however,

Crawford's failure to account for the missing insurance funds weighs only into the totality of Crawford's appreciation for the seriousness of bankruptcy and her lack of candor throughout her petition.

### c. False Oaths/Concealment regarding Payment to Arlene Foulks

Without a doubt, Crawford gave Foulks a cashiers check for $7500, which was not disclosed. However, what happened next is not clear. The evidence presented on whether Foulks then gave Crawford $7500 in cash is conflicting. On the one hand, it never became clear why Crawford would need Foulks to deposit a *cashiers* check in order to obtain cash. Foulks, the target of an adversary proceeding brought by Taylor, certainly had an incentive to claim that her receipt of the check was not in repayment of an antecedent debt. On the other hand, Crawford had an incentive to say that Foulks never gave her cash as such an admission would suggest bankruptcy fraud.

In the end, the Court makes no findings or conclusions as to what happened after Crawford gave Foulks the cashiers check as neither witness's testimony was more credible the other's.

### d. False Oaths/Concealment regarding Bank Accounts

Crawford admitted that her petition failed to disclose two accounts she held with James Ridenbacker. She now says this was due to her own error. Not to belabor the point, but Crawford's self-described "mistakes" begin to look less and less like mistakes as more of them are revealed.

Crawford's handling of the account she opened for Ladd Morrison as his attorney in fact and failure to disclose the same is sufficient standing alone to deny Crawford a discharge under 11 U.S.C. § 727(a)(4)(A). Crawford's own testimony established that

14

her sworn statements regarding the Morrison account were false and that she knew as much when she made the statements. Crawford is the person who opened the Morrison account, who regularly deposited and withdrew money, and who acted as Morrison's power of attorney. However, her petition and statement of financial affairs lack even a suggestion of the existence of the Morrison account. And, Crawford failed to mention it at her 341 meeting or during her 2004 examination.

The omission was also material. Crawford deposited her own funds into the account, treated the account as her own, and, allegedly, paid debts out of the account. These activities bear directly on property of the bankruptcy estate, Crawford's business dealings, and the disposition of her property.

Turning to Crawford's intent, even considering the timeline of events according to Crawford, the very nature of the account and cash transactions smells of fraud. Crawford says she opened the account in Morrison's name for the mother of Morrison's child using a power of attorney. She deposited checks from her personal account into the Morrison account for repayment of some unknown debt (also not scheduled). Crawford then says she withdrew a total $37,000 in cash structured so that no single withdrawal exceeded $10,000 (presumably to avoid the currency reporting requirements of 31 CFR 1010.311, which is a crime in itself). She allegedly gave the cash to Morrison's cousin. Despite this substantial sum, Crawford never provided any plausible explanation as to these extraordinary transactions or why she "forgot" to disclose the account; her tale left many more questions than answers.

The stench of fraud intensifies when Crawford's story is considered in light of her numerous sworn misstatements regarding her real property, payments to creditors, and

other bank accounts.  That odor becomes overwhelming given that Crawford failed to put forth any credible evidence to corroborate her account of what actually happened to the cash.  *In re Reed*, 700 F.2d 986, 992-93 (5th Cir. 1983) ("While the burden of persuasion rests at all times on the creditor objecting to discharge, it is axiomatic that the debtor cannot prevail if he fails to offer credible evidence after the creditor makes a prima facie case.  The creditor's burden of persuasion does not obviate the necessity that the debtor provide a satisfactory explanation of the loss of his assets.").  At the very least, Crawford's failure to disclose these highly questionable transactions constitutes reckless indifference for the truth.  More likely, these acts were fraudulent and point to yet another failure to be forthright regarding her affairs.

## IV. Conclusion

Crawford is not the honest but unfortunate debtor the Bankruptcy Code has long and zealously protected.  Her actions related to the Morrison account are sufficient in isolation to deny her a discharge pursuant to 11 U.S.C. § 727(a)(4)(A).  The Morrison account is, however, merely the tip of the iceberg.  She also failed to schedule real property, failed to make any meaningful inquiry into her real property ownership interests, failed to truthfully classify her real property ownership interests, failed to disclose payments to creditors, failed to divulge payments to a business she owned, failed to account for substantial monies received from an insurance settlement, and failed to disclose numerous bank accounts.  After all this, Crawford blessed her misstatements as truth by signing her petition under penalty of perjury and testifying under oath at her first meeting of creditors and 2004 examination.  Considering the totality of these circumstances, Crawford has established a course of conduct throughout this case of

playing fast and loose with her assets and sworn statements.  She repeatedly acted recklessly regarding the truth and does not grasp the serious undertaking of filing bankruptcy.  If all debtors conducted themselves in this manner, the bankruptcy system would grind to a halt and become prohibitively expensive for creditors and trustees to determine whether the information provided is true.

Accordingly, Crawford's discharge is denied pursuant to 11 U.S.C. § 727(a)(4)(A).  Given that this matter may implicate criminal acts including violations of 18 U.S.C. §§ 151 through 158, the Clerk is directed to forward a copy of this order to the United States Attorney's Office for the Western District of North Carolina.  18 U.S.C. § 3057 ("Any judge, receiver, or trustee having reasonable grounds for believing that any violation under chapter 9 of this title or other laws of the United States relating to insolvent debtors, receiverships or reorganization plans has been committed, or that an investigation should be had in connection therewith, shall report to the appropriate United States attorney all the facts and circumstances of the case, the names of the witnesses and the offense or offenses believed to have been committed.  Where one of such officers has made such report, the others need not do so.").

**SO ORDERED**

This Order has been signed electronically. The Judge's signature and Court's seal appear at the top of the Order.

United States Bankruptcy Court

17